IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | |
|---|---|
| MARVIETTA L. HOPPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No: 1:14-cv-01190-STA-cgc |
| ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**

Plaintiff Marvietta L. Hopper filed this action to obtain judicial review of Defendant Commissioner's final decision denying her application for disability insurance benefits under Title II of the Social Security Act ("Act") and an application for Supplemental Security Income ("SSI") under Title XVI of the Act. Plaintiff's applications were denied initially and upon reconsideration by the Social Security Administration. Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on December 12, 2012. On March 4, 2013, the ALJ denied the claim. The Appeals Council subsequently denied her request for review. Thus, the decision of the ALJ became the Commissioner's final decision. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he was a party. "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the

cause for a rehearing."[1] The Court's review is limited to determining whether there is substantial evidence to support the Commissioner's decision,[2] and whether the correct legal standards were applied.[3]

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[4] It is "more than a mere scintilla of evidence, but less than a preponderance."[5] The Commissioner, not the Court, is charged with the duty to weigh the evidence, to make credibility determinations and resolve material conflicts in the testimony, and to decide the case accordingly.[6] When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion.[7]

Plaintiff was born on May 12, 1980. She has a high school education. She alleges that she became disabled beginning April 2, 2008, due to migraines and bipolar disorder. She has past relevant work as a sales clerk, assistant manager, loan approval agent, waitress, and automotive service advisor.

---

[1] 42 U.S.C. § 405(g).

[2] *Id.*

[3] *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). *See also Landsaw v. Sec'y of Health & Human Servs*, 803 F.2d 211, 213 (6th Cir. 1986).

[4] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389 (1971)).

[5] *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[6] *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

[7] *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The ALJ made the following findings: (1) Plaintiff met the insured status requirements through December 31, 2012; (2) Plaintiff has not engaged in substantial gainful activity since the alleged onset date; (3) Plaintiff has severe impairments of major depressive disorder, generalized anxiety disorder, cervical stenosis with radiculopathy, arthralgias, migraines, and a history of substance abuse; but she does not have impairments, either alone or in combination, that meet or equal the requirements of any listed impairment contained in 20 C.F.R. pt. 404, subpt. P, app. 1 of the listing of impairments; (4) Plaintiff retains the residual functional capacity to perform a range of medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c): she can lift and/or carry (including upward pulling) fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull (including operation of hand and/or foot controls) without limit; understand and remember simple and detailed (one-to-three step) tasks and instructions; sustain adequate concentration, persistence, and pace for the above tasks for two-hour segments across a normal work day and work week; interact with and get along adequately with coworkers, supervisors, and infrequently with the general public; adapt and respond to changes in a routine work setting; and make/set work-related plans and goals independently; (5) Plaintiff is unable to perform her past relevant work; (6) Plaintiff was a younger individual with a high school education on the alleged onset date; (7) transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules ("the grids") as a framework supports a finding that Plaintiff is not disabled whether or not she has transferable job skills; (8) considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform; (9) Plaintiff was not under a disability as defined in the Act at any time through the date of this decision.[8]

The Social Security Act defines disability as the inability to engage in substantial gainful activity.[9] The claimant bears the ultimate burden of establishing an entitlement to benefits.[10] The initial burden of going forward is on the claimant to show that he or she is disabled from engaging in his or her former employment; the burden of going forward then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background.[11]

The Commissioner conducts the following, five-step analysis to determine if an individual is disabled within the meaning of the Act:

1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. An individual who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the regulations.

4. An individual who can perform work that he has done in the past will not be found to be disabled.

5. If an individual cannot perform his or her past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.[12]

---

[8] R. 15 – 25.

[9] 42 U.S.C. § 423(d)(1).

[10] *Born v. Sec'y of Health & Human Servs*, 923 F.2d 1168, 1173 (6th Cir. 1990).

[11] *Id.*

[12] *Willbanks v. Sec'y of Health & Human Servs*, 847 F.2d 301 (6th Cir. 1988).

Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis.[13] Here, the sequential analysis proceeded to the fifth step with a finding that, although Plaintiff cannot perform her past relevant work, she can perform a significant number of jobs existing in the national economy.

Plaintiff argues that substantial evidence does not support the ALJ's decision. She specifically argues that the ALJ erred in the assessment of the medical evidence, in the assessment of her credibility, and in the formulation of her residual functional capacity. Plaintiff's arguments are not persuasive.

Plaintiff contends that the ALJ should have afforded controlling weight to a medical source statement form completed by Carol Newman, a nurse practitioner from the Bemis Medical Clinic. Concerning Plaintiff's physical limitations, NP Newman opined that Plaintiff could lift a maximum of ten pounds, could stand/walk about four hours during the course of a workday, and could sit an unlimited amount during the same workday but she needed to alternate sitting and standing about every thirty minutes. She opined that Plaintiff would need to lie down during the day for undetermined amount of time. According to NP Newman, Plaintiff's MRI had shown cervical stenosis and bulging disks, which explained why she needed workplace restrictions. Plaintiff was limited to occasional postural activities like twisting, bending, and climbing stairs, and she is unable to climb ladders. Plaintiff's reaching and pushing/pulling were "affected" by her impairments to an unspecified extent. NP Newman opined that Plaintiff had a balance impairment due to her medications and that she had an anxiety disorder.[14]

---

[13] 20 C.F.R. § 404.1520(a).

[14] R. 548-49.

As for Plaintiff's mental functioning, NP Newman opined that Plaintiff had marked restrictions in her ability to understand and remember simple instructions and in her ability to make judgments on complex work-related decisions and Plaintiff had moderate restrictions in her ability to handle the other intellectual demands of work, including her ability to carry out simple instructions, make judgments on simple work-related decisions, understand/remember complex instructions, and carry out complex instructions. NP Newman explained that Plaintiff's narcotic pain medications affected her ability to function. NP Newman further opined that Plaintiff did not have any social restrictions.[15]

Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c). Under the treating physician rule, an ALJ must give controlling weight to the opinion of a claimant's treating physician if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."[16] The term "not inconsistent" is meant to convey that "a well-supported treating source medical opinion need not be supported directly by all of the other evidence, (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."[17]

Generally, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination,[18] and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source

---

[15] R. 937-38.

[16] 20 C.F.R. § 404.1527(c)(2).

[17] Soc. Sec. Rul. 96–2P.

[18] 20 C.F.R. § 404.1502, 404.1527(c)(1).

6

who has examined the claimant but does not have an ongoing treatment relationship.[19] In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."[20] Opinions from nontreating sources are not assessed for "controlling weight." Instead, these opinions are weighed based on specialization, consistency, supportability, and any other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.[21] State agency consultants are highly qualified specialists who are also experts in the Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions.[22]

The weight assigned to a medical opinion can also depend on whether the source is an "acceptable medical source" or an "other medical source."[23] Both acceptable and other medical sources are assessed by the above criteria. While an "other medical source" can sometimes be assigned significant weight, a competing acceptable medical source opinion is due more weight than an otherwise identical "other medical source" opinion. The ALJ has more discretion in evaluating the weight to be assigned to other medical source opinions.[24]

---

[19] *Id.* § 404.1502, 404.1527(c)(2).

[20] Soc. Sec. Rul. No. 96–6p.

[21] 20 C.F.R. § 404.1527(c).

[22] *See* 20 C.F.R. § 404.1527(e)(2)(i).

[23] *See* Social Security Ruling (SSR) 06-3p. *See also* 20 C.F.R. § 416.913(a) (explaining that non-physician medical professionals are other medical sources to be distinguished from acceptable medical sources like physicians).

[24] Only an acceptable medical source can be given controlling weight. *See* SSR 06-3p, *2 ("only 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

The Court finds that the ALJ adequately explained why he gave little weight to NP Newman's opinion. For example, NP Newman suggested that Plaintiff's bulging disks in her back and neck were responsible for Plaintiff's pain, but Plaintiff's MRI scans showed that there was no nerve root impingement.[25] An acceptable medical source, Dr. Eric Homberg, reviewed Plaintiff's cervical spine MRI and concluded that the mild disc disease shown on the scan did "not correlate with the distribution of her pain complaint."[26] Additionally, NP Newman's medical source statement conflicted with her own treatment notes, which did not describe the level of impaired gait or strength deficits suggested by her medical source statements.

Finally, the ALJ pointed out that NP Newman's medical opinion described mental restrictions that were not supported by the record. For instance, NP Newman suggested that Plaintiff had marked restrictions in her ability to complete even simple tasks, but evidence from acceptable medical sources like Dr. Kennon found that Plaintiff's cognitive ability, memory, and concentration were not impaired.[27]

Plaintiff argues that the ALJ should have included functional limitations based on her headache-related complaints. While the ALJ agreed that Plaintiff had headaches that reduced her residual functional capacity, substantial evidence supports the ALJ's conclusion that the headaches were not as long-lasting or severe as Plaintiff claims.

Although Plaintiff sought frequent care for her headaches, her doctors found little objective evidence consistent with the extent of her alleged complaints. Plaintiff had an MRI of her cervical spine, which showed congenital stenosis of the central canal, and mild narrowing,

---

[25] R. 531-32, 548, 560-61.

[26] R. 970.

[27] R. 405-06.

but no focal or acute disc herniation and no significant nerve root impingement.[28] Dr. Homberg reviewed Plaintiff's cervical spine MRI and concluded that the mild disc disease shown on the scan did "not correlate with the distribution of her pain complaint," although he believed the scan provided an explanation for her headaches.[29] Plaintiff complained of a headache and requested pain medication at the emergency room on June 9, 2012, but her neurological examination was normal.[30]

Plaintiff was generally consistent in telling her doctors that her medications were effective in relieving her chronic pain. For example, treatment notes from June and July 2012 show that Plaintiff told her doctors that medication was effective for relieving her chronic pain.[31] Although Plaintiff complained that her pain medications did not help on April 16, 2012, NP Newman told Plaintiff that she should be using the pain medications sparingly, consistent with the concern that Plaintiff was overusing her medications.[32]

Consultative examiners Stephen K. Goewey, M.D., and Robert Kennon, Ph.D., failed to find clinical evidence supporting Plaintiff's alleged limitations. Although Plaintiff claimed that she had a spot on her brain that was being followed by doctors and had migraines three times a week, Dr. Goewey's physical examination was completely normal, including normal gait and normal strength, even though he noted that Plaintiff gave "suboptimal effort."[33] He concluded

---

[28] R. 531-32, 560-61.

[29] R. 970.

[30] R. 538.

[31] R. 501-27.

[32] R. 965.

[33] R. 393-94.

9

that Plaintiff could lift up to one hundred pounds and that she could sit/stand/walk enough to tolerate a full workday.[34]

Dr. Kennon saw Plaintiff for a psychological examination. Plaintiff denied any significant medical problems besides migraines and showed no difficulties understanding or remembering, and she had normal gait. Plaintiff admitted that she had a hydrocodone addiction in the past.[35] Dr. Kennon opined that her ability to concentrate on simple tasks, remember, and interact socially was normal.[36] He concluded that Plaintiff could perform simple tasks and interact with others.[37]

Substantial evidence supports the weight given to the medical evidence and opinions in the record and the evaluation of Plaintiff's residual functional capacity. The ALJ properly determined that Plaintiff could perform a range of medium work, and Plaintiff has failed to show that she is otherwise more limited.

Next, Plaintiff complains that the ALJ incorrectly assessed her credibility. A claimant's credibility comes into question when his or her "complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence."[38] To assess credibility, the ALJ must consider "the entire case record," including "any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating

---

[34] R. 397.

[35] R. 404.

[36] R. 405-06.

[37] R. 406-07.

[38] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).

physicians and others, as well as any other relevant evidence contained in the record."[39] This Court is required to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying,"[40] although the ALJ's credibility finding must find support in the record.

Here, the ALJ sufficiently explained his credibility finding consistent with SSR 96-7p by discussing what the medical evidence and other evidence indicated as to the intensity, persistence, and limiting effects of Plaintiff's symptoms in contrast to her allegations of disabling symptoms. As the ALJ determined, Plaintiff's treatment history, history of drug-seeking, and lack of intense medical care all suggested that Plaintiff's headaches and other problems were not as severe as she alleged.

Plaintiff admits that doctors accused her of drug-seeking behavior, but she claims that it did not happen enough times to be relevant. To the contrary, the record is replete with references to the concerns of Plaintiff's medical care providers about her drug-seeking behavior. For instance, on August 1, 2007, NP Newman noted that another provider had called to warn her that Plaintiff had exhibited drug-seeking behavior when she requested Ambien and then "stormed out of the office angry" after being told she would not receive additional medication.[41]

Additionally, at one point, Plaintiff claimed that she had a headache but that her medications had all been stolen by workers at her house; she was refused the extra medication and told to return with a police report to verify her story, but there is no evidence that she did

---

[39] *Id.*

[40] *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citations omitted).

[41] R. 342.

11

so.[42] On October 3, 2007, Plaintiff was denied cold medication due to the risk of her overdosing since she was also taking narcotics.[43] On April 9, 2009, doctors refused to refill her narcotic pain medication because she had received thirty hydrocodone just a few days previously.[44] On April 10, 2009, Downtown Medical Clinic reported that Plaintiff was "known for going all over town [and] for using children to get controlled substances."[45]

Abuse potential was noted on July 2, 2009, and July 20, 2009.[46] On February 4, 2010, NP Newman received a report about Plaintiff's excessive emergency room visits, and NP Newman reminded Plaintiff that she was supposed to get narcotics only from her.[47]

On April 9, 2012, NP Newman noted that Plaintiff was complaining of a four-day headache, but she refused Plaintiff's request for pain medications.[48] Several days later, Plaintiff requested a refill of Xanax, but NP Newman again refused, explaining that her refill was not due for five more days and warning Plaintiff that she should not take more than prescribed.[49] On May 15, 2012, Plaintiff complained of a long-lasting headache, and NP Newman again refused to give Plaintiff more narcotics.[50] On May 30, 2012, NP Newman reported that Plaintiff asked

---

[42] R. 340-41.

[43] R. 335.

[44] R. 308.

[45] R. 306.

[46] R. 295-97.

[47] R. 272.

[48] R. 975.

[49] R. 967.

[50] R. 959.

for Xanax but that she would "not give any more Xanax today" and that Plaintiff "must take [it] as prescribed."[51]

On June 11, 2012, Plaintiff reported to the emergency room complaining of a headache, but the attending doctor "asked [the patient] 3 times directly and specifically when the last time she saw and received/filled a prescription," and that the patient had answered each time that she had not received them since February.[52] However, a computer printout that showed she had filled a prescription for 120 Lortab just twelve days previously, and Plaintiff responded, "[Oh] yeah, I forgot."[53] Plaintiff still asked for the prescription.

Plaintiff even admitted to Dr. Kennon that she had a history of prescription drug abuse.[54] In making his credibility determination, it was not error for the ALJ to consider that Plaintiff was drug-seeking and had been accused her of using her children to obtain medications.[55]

Plaintiff's daily activities also contradicted her claims of disabling impairments. Plaintiff told Dr. Kennon that she performed dish washing, vacuuming, sweeping, light chores, maintenance and yard work and that she could care for herself independently.[56] Dr. Kennon noted that Plaintiff "appears to be able to carry out most daily chore activities with adequate

---

[51] R. 956.

[52] R. 567.

[53] R. 567.

[54] R. 404.

[55] *See Byrd v. Comm' r of Social Sec.*, 2013 WL 1150138, at *7 (N.D. Ohio Jan. 14, 2013), *report and recommendation adopted*, 2013 WL 1154295 (N.D. Ohio Mar. 19, 2013) ("[A] claimant's drug-seeking behavior coupled with refusals by treating physicians to prescribe narcotics is sufficient to undermine the claimant's credibility.")

[56] R. 404.

effectiveness and persistence."[57] Plaintiff reported that her nose hurt because she had run into her daughter while playing basketball.[58] The ALJ could properly take note of Plaintiff's admissions regarding her daily activities as part of his overall assessment of Plaintiff's credibility.[59]

The Court finds no error in the ALJ's credibility determination because Plaintiff did not provide objective medical evidence to establish the intensity and persistence of her alleged symptoms, and the record as a whole does not indicate that her condition was of disabling severity. Although Plaintiff presented objective medical evidence of an underlying medical condition and the ALJ found that her impairments could reasonably cause the kind of limitations alleged by Plaintiff, Plaintiff's statements about the intensity, persistence, and limiting effect of her alleged symptoms were not entirely credible because they were inconsistent with the evidence of record. The ALJ carefully considered the record as a whole. Accordingly, the ALJ's credibility determination is supported by substantial evidence.

At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile.[60] The Commissioner may carry this burden by applying the grids[61] which direct a conclusion of

---

[57] R. 404.

[58] R. 312.

[59] *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("Further, the ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."); 20 C.F.R. §§ 404.1529, 416.929.

[60] *Jones*, 336 F.3d at 474.

[61] 20 C.F.R. Pt. 404, Subpt. P, App. 2.

"disabled" or "not disabled" based on the claimant's age and education and on whether the claimant has transferable work skills.[62]

Here, the ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of medium work has been impeded by additional limitations. To determine the extent that these limitations eroded the unskilled medium occupational base, the ALJ sought the testimony of a vocational expert who testified that Plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as a kitchen helper, hand packager, and driver helper.[63] Thus, substantial evidence supports the ALJ's determination that Plaintiff was not disabled, and the decision of the Commissioner is **AFFIRMED**.

    **IT IS SO ORDERED.**


                                                           s/ S. Thomas Anderson
                                                           S. THOMAS ANDERSON
                                                           CHIEF UNITED STATES DISTRICT JUDGE

                                                           Date:   July 20, 2017.

---

[62] *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003); *Burton v. Sec'y of Health & Human Servs.*, 893 F.2d 821, 822 (6th Cir. 1990).

[63] R. 25.